Paul MURPHY, Plaintiff–Appellant,

v.

Michael P. LANE, Director of Department of Corrections, Richard Gramley, Warden of Dixon Correctional Center, Linda Dillon, Dr. Anteas Mesrobian and Otto Wallin, Defendants–Appellees.

No. 87–1234.

United States Court of Appeals,
Seventh Circuit.

Submitted July 8, 1987.

Decided Nov. 6, 1987.

Paul Murphy, pro se.

Timothy J. Cavenagh, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before WOOD, CUDAHY, and COFFEY, Circuit Judges.

PER CURIAM.

Paul Murphy, a psychiatric inmate at Dixon Correctional Center, filed his fifth lawsuit under 42 U.S.C. § 1983 against prison officials in October 1986. In this case, he challenges the prison officials' decision to transfer him to Logan Correctional Center, a prison allegedly unequipped to provide psychiatric care. The district court dismissed Murphy's complaint *sua sponte* for failure to state a claim under § 1983. In doing so, the court noted that Murphy is a "serial litigator" who "files a new action every time an incident occurs in his treatment/confinement which does not meet his expectations." Murphy appeals.

Although a district court may dismiss a complaint on its own motion, *see Bryan v. Johnson*, 821 F.2d 455 (7th Cir. 1987), such dismissals are not favored. *Eades v. Thompson*, 823 F.2d 1055, 1061–62 (7th Cir.1987). Dismissal "is not a decision for the district court to make lightly,"

*Gomez v. Illinois State Board of Education,* 811 F.2d 1030, 1039 (7th Cir.1987). The district court "must accept the well-pleaded allegations of the complaint as true. In addition, the court must view these allegations in the light most favorable to the plaintiff." *Id.* The complaint should be dismissed for failure to state a claim only if it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

■ Murphy's complaint sets forth the following facts. Murphy is a suicidal, psychiatric inmate at Dixon Correctional Center who had seen a psychiatrist three times in the months prior to September 1986. The last visit was on September 5, 1986, when the prison psychiatrist told him that she would start seeing him on a regular basis. On September 9, 1986, however, defendant Otto Wallin, upon instructions from defendant Linda Dillon, informed Murphy that he would be transferred to the Logan Correctional Center the following day. Murphy claims that the news so distressed him that he attempted to take his own life by swallowing the crushed glass from a pair of eyeglasses.

The prison medical director, defendant Dr. Anteas Mesrobian, was notified of Murphy's suicide attempt about two hours later and he ordered Murphy admitted to a hospital for observation and testing. Mesrobian never personally saw Murphy during his hospital stay, but he ordered Murphy's release six and one-half hours later. The release occurred in time for Murphy to make the 200–mile van trip for his scheduled transfer to Logan. Upon his arrival, Murphy was placed on "crisis care watch." He saw a psychiatrist one week later, who placed him on a tranquilizer and an anti-depressant. The doctor also recommended Murphy's transfer back to the Special Treatment Center at Dixon, and, the following day, Logan's assignment committee approved the recommendation. In the meantime, Murphy was placed in Logan's segregation unit for four days due to the

officials' concern regarding his mental condition.

The gist of Murphy's complaint is that prison officials acted in deliberate indifference to his serious psychological needs, in violation of the eighth amendment, when they transferred him to a prison that could not provide him with necessary psychiatric care. He also claims that the prison violated its own rules by informing him of the pending transfer, that Dr. Mesrobian deliberately put his life in danger when he allowed him to take the 200–mile van trip so shortly after his suicide attempt, and that he never received a six-month evaluation, as required by Ill.Rev.Stat. Ch. 38 § 1003–8–4(b) and Ill.Dept. of Corr. Rule 415.60, in order to determine whether he should be transferred to the general prison population. Finally, Murphy alleges that the decision to transfer him to a non-psychiatric facility was in retaliation for his filing of other lawsuits against the same prison officials and that they have conspired to deprive him of his constitutional rights and to aggravate his mental condition. Murphy therefore seeks injunctive and monetary relief to prevent further violations of his constitutional rights.

■ In order to successfully state a cause of action against prison officials under the eighth amendment for failure to provide inmates with a medical care system that meets minimal standards of adequacy, a plaintiff must be able to demonstrate that prison medical personnel were "deliberately indifferent to his serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Mere negligence on the part of a physician in diagnosing or treating a medical condition will not, in and of itself, suffice. *Id.* at 106, 97 S.Ct. at 292. Similarly, excusable delay in properly treating an inmate that does not amount to deliberate indifference, does not rise to the level of a cognizable eighth amendment claim. *Shockley v. Jones,* 823 F.2d 1068, 1072 (7th Cir.1987).

A "deliberate indifference" can be evidenced by repeated examples of negligent acts which disclose a pattern of conduct by

the prison medical staff, or it can be demonstrated by "proving there are such systematic and gross deficiencies in staffing, facilities, equipment or procedures that the inmate population is effectively denied access to adequate medical care." *Wellman v. Faulkner*, 715 F.2d 269, 272 (7th Cir. 1983) (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981)).

Thus, the question on review is whether the district court erred in holding that Murphy's complaint fails to establish either a pattern of repeated negligent acts by the prison's medical staff, or such systematic and gross deficiencies in staffing, facilities, equipment or procedures to deny Murphy and the inmate population access to adequate medical care. We hold the district court did not err.

Although the prison officials' actions here might be best characterized as irresponsible in caring for Murphy, the facts alleged do not support a claim of deliberate indifference. At both Dixon and Logan, Murphy received psychiatric care. While he did not see a psychiatrist immediately after his suicide attempt, he was given prompt medical treatment. Upon his arrival at Logan he was placed on a "crisis care watch" and was seen by a psyciatrist at the end of that week. It was determined shortly after Murphy's arrival that Logan was not equipped to care for his psychiatric problems. While he awaited his transfer back to Dixon, Murphy received medication for his depression and was placed in segregation so that prison officials could keep a closer watch on him.

We acknowledge that the prison officials showed a lack of good judgment in transferring Murphy to a prison that was not properly staffed to care for his psychiatric needs; and even worse, that they waited an entire week before having a psychiatrist observe and evaluate the suicidal inmate. However, based on the facts alleged in Murphy's complaint, these two incidents not only fall far short of establishing a pattern of repeated negligent acts on the part of the prison medical staff, but also fail to establish such systematic and gross deficiencies in staffing, facilities, equipment or procedure to deny Murphy and the inmate population access to adequate medical care. The complaint thus fails to establish that the prison's medical staff acted with deliberate indifference. Accordingly, since he has failed to allege facts to support his claim that he was deprived of his constitutional rights, Murphy has failed to allege facts to support his claim that prison officials conspired under color of state law to deprive him of those rights. *See, e.g., Vaden v. Village of Maywood*, 809 F.2d 361, 366 (7th Cir.1987). In addition, Murphy's state claims must also fail. As we stated in *Kasper v. Board of Election Commissioners of the City of Chicago*, 814 F.2d 332, (7th Cir.1987), "[a] violation of state law does not state a claim under § 1983; we have rejected such contentions repeatedly." *Id.* at 342.

■ However, as we attempted to make clear at the outset, district courts should ordinarily proceed with a good measure of caution when dismissing complaints on their own motion. In this case, we think Murphy's claim that his transfer to Logan was initiated in retaliation for his litigious propensities was dismissed prematurely. With respect to allegations of retaliatory conduct made by prisoners against their custodians, this court has previously observed:

> Recognizing that the ultimate fact of retaliation for the exercise of a constitutionally protected right rarely can be supported with direct evidence of intent that can be pleaded in a complaint, *cf. Buise v. Hudkins*, 584 F.2d 223 (7th Cir. 1978), courts have found sufficient complaints that allege a chronology of events from which retaliation may be inferred. *See, e.g., McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979). Conversely, alleging merely the ultimate fact of retaliation is insufficient.

*Benson v. Cady*, 761 F.2d 335, 342 (7th Cir.1985). Our review of the record persuades us that, for purposes of overcoming dismissal, Murphy's complaint does in fact set forth a chronology of events from

which retaliatory animus on the part of defendants could arguably be inferred.[1] We therefore reverse the district court's dismissal of the retaliatory transfer component of Murphy's complaint and remand that one issue for further proceedings.

The judgment of the district court is thus,

AFFIRMED IN PART; REVERSED IN PART.

---

1. The chronology of events in Murphy's case, as demonstrated by the record, is as follows: Murphy had filed four lawsuits against prison officials during the months of July through September 1986. Among the prison officials named in these lawsuits were Warden Lane and Superintendent Dillon. Murphy alleges that, on September 9, 1986, he was told of his pending transfer from Dixon Correctional Center to Logan Correctional Center and was told that Dillon wanted him to know of the transfer. Murphy further alleges that Dillon knew that this information would prompt him to attempt suicide. Murphy's complaint states specifically that:

This is all manifested by the fact that the transfer was in retaliation for plaintiff seeking his constitutional right to seek judicial relief and redress. All the defendants in this action are defendants in previous Civil Rights actions filed by the plaintiff.

Murphy's transfer immediately followed his filing of these lawsuits, thus permitting the inference that the transfer was in retaliation for the lawsuits. Moreover, Murphy's complaint alleges that his transfer represented a change for the worse since Logan was unequipped to handle his psychiatric needs.